```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


LISA R. HENDERSON,             )
                               )
          Plaintiff,           )
                               )
          v.                   )         1:16cv1410
                               )
THE UNIVERSITY OF NORTH        )
CAROLINA AT CHAPEL HILL,       )
                               )
          Defendant.           )
```

### MEMORANDUM OPINION AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendant's Motion for Summary Judgment" (Docket Entry 32) (the "Motion"). For the reasons that follow, the Court should deny the Motion.

### FACTUAL AND PROCEDURAL HISTORY

Plaintiff filed an Amended Complaint (Docket Entry 8) alleging that her former supervisor at the University of North Carolina ("UNC"), Darius Dixon ("Dixon"), sexually harassed and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"). (Id., ¶¶ 1, 60-77.)[1] Defendants UNC and Dixon filed a

---

[1] The caption of Plaintiff's original Complaint (Docket Entry 1) named the "Board of Governors of the University of North Carolina at Chapel Hill" as a defendant (id. at 1). Plaintiff's First Amended Complaint identifies the "Board of Governors of the

motion to dismiss the Amended Complaint (Docket Entry 10). Thereafter, the Court dismissed the hostile work environment claims and all claims against Dixon, but allowed the Title VII and Title IX retaliation claims against UNC to proceed. (See Docket Entry 19 at 1-2.) Following discovery, UNC moved for summary judgment (Docket Entry 32), which Plaintiff opposes (Docket Entry 34).

Viewed in the light most favorable to Plaintiff, the record reflects:

Plaintiff began working as an executive assistant for Dixon in UNC's housekeeping services department in July of 2015. (See Docket Entry 32-2 at 33:14-33:23.) Her responsibilities included, inter alia, "handl[ing] uniform services [and] invoices[,] . . . prepar[ing] for . . . meetings[, and] doing the positioning spreadsheet of all of the employees that were employed for [the] housekeeping services department." (Id. at 33:24-34:12.) Plaintiff also prepared vacancy reports, which involved providing information regarding temporary employees hired to fill vacancies.

University of North Carolina" (the "Board") as Plaintiff's employer (Docket Entry 8 at 1), and "Defendants recognize that the Board is the corporate entity of the University 'capable in law to sue and be sued' under N.C.G.S. § 116-3" (Docket Entry 10 at 1 n.1). However, Defendants assert that, "for Title VII purposes, the University of North Carolina at Chapel Hill, a constituent institution of the University of North Carolina system, was Plaintiff's employer of record. For clarity, Defendants consent to an amended or updated caption identifying the employer-Defendant as The University of North Carolina at Chapel Hill." (Id.) For purposes of this Opinion, the undersigned refers to Plaintiff's employer as UNC.

-2-

Case 1:16-cv-01410-TDS-LPA   Document 36   Filed 06/27/18   Page 2 of 16

(See id. at 35:1-35:15.) When Plaintiff started in that position, she lived in North Carolina with her mother, and Plaintiff's husband lived in Maryland. (See Docket Entry 34-2 at 27:12-28:3.) Every other weekend, Plaintiff traveled to visit her husband on Friday and returned to North Carolina on Sunday. (See id. at 28:3-28:6.)

Shortly after Plaintiff began working as Dixon's executive assistant, Dixon "came in an[d] sat at the table with" Plaintiff and two of her coworkers at lunch and stated: "[W]hen I love[,] I love hard." (Id. at 103:21-104:6.) In November of 2015, following issues involving Plaintiff submitting inaccurate invoices, Dixon remarked to Plaintiff in front of another employee that he felt Plaintiff "was 50 percent here and 50 percent in Maryland and that maybe when [her] husband moves here, [Dixon will] get his other 45 percent." (Id. at 92:12-92:16; see also Docket Entry 32-8, ¶¶ 21, 24, 26.) Plaintiff "thought that the comment was [in]appropriate and not professional to do it in front of a coworker. And it was touching onto [her] personal life, which [she] really felt was inappropriate." (Docket Entry 32-2 at 92:7-92:10.) Plaintiff asked to speak with Dixon about that comment, to which he responded that she should follow up with Human Resources ("HR"). (See id. at 91:1-91:5.) Accordingly, Plaintiff spoke with Tracy Agnew ("Agnew") in HR regarding Dixon's comment. (See id. at 91:25-92:16.)

"Part of [Plaintiff's] job was to meet [one-on-one] with [] Dixon on a weekly basis." (Id. at 94:9-94:10.) On December 14, 2015, "[w]hen [Plaintiff] went into that [weekly] meeting, [Dixon] shut the door. He said before [they] get started with this one-on-one, [he] want[ed] to know what [her] living arrangements [we]re. [Plaintiff] asked him what . . . that ha[d] to do with [her] job." (Id. at 94:13-94:16.) Thereafter, Plaintiff emailed Chariss Jones ("Jones") in HR, saying that "[she was] feeling very uncomfortable with the questions Mr. Dixon continues to ask [her] about [her] personal life activities outside of the work week." (Docket Entry 34-4 at 1.) In response, Jones proposed conducting a "facilitated conversation" with Plaintiff, Dixon, Jones, and Kristy Nash ("Nash"). (Id. at 2; see also Docket Entry 34-6 at 3.)

In that meeting, Plaintiff stated that she "[did]n't appreciate [Dixon] worrying about [her] whereabouts after work. [Dixon] stated, well, she's been ripping and running up and down the roads to Maryland and that's putting wear and tear on her body." (Docket Entry 32-2 at 99:4-99:8.) Plaintiff further explained:

> [Dixon] wasn't asking anyone else [questions regarding their living arrangements]. He tried to make it a contingency of my employment, but that was not in my offer letter. I've never heard of a job requiring you to live close to your job. There are people driving from Charlotte to UNC-CH. I don't know why he wanted that type of control, but it was only put on me, and I was very uncomfortable with it.

-4-

(Docket Entry 34-6 at 3.)  Plaintiff had also explained to HR that Dixon's behavior made her uncomfortable because "as a teenager . . . [she] was raped, and [she] didn't use her gut feeling, and [she] ended up in a situation where [she] was raped as a teenager. . . . [She] told [Jones] about her past as a teenager and that [she] wanted these lines of questioning [] to stop." (Id.; see also Docket Entry 34-1 at 26.)  "[Jones] asked [Plaintiff] if it was ok if [she] relayed what had happened to [Plaintiff] to [Dixon] . . . . [Dixon] said he didn't want to know because he didn't want to be accused of saying something about it." (Docket Entry 34-6 at 3-4.)

In Plaintiff's six-month performance review, Dixon wrote: "Trust is a key component of the inter [sic] working of the Director's position and the Executive Assistant position.  The trust factor is very low between both of us due to the perception of actions we both felt needed the involvement of Human Resour[c]es and Employee Relations."  (Docket Entry 34-7 at 5.)  He also noted that Plaintiff's performance regarding organizational charts "[was] not meeting expectations," despite Plaintiff's assertions that she completed and submitted them as required.  (Id. at 4 (capitalization omitted); see also Docket Entry 34-8 at 5-7.) Further, the performance review form states that a "corrective action plan [is] required for all ratings of not meeting

-5-

expectations," although the form did not detail any such plan. (Docket Entry 34-7 at 5 (capitalization and parentheses omitted).)

UNC fired Plaintiff on March 11, 2016. (See Docket Entry 32-8, ¶ 41.) The decision to fire Plaintiff involved Dixon's recommendation, "input from Tracy [Agnew] in HR. . . . [and] input from Employee Relations, which would have been Gena Carter [and] Chariss Jones." (Docket Entry 34-3 at 15.) On the date of Plaintiff's firing, Dixon did not provide "specific performance or conduct issues" in the "standard" termination letter he read to her. (Docket Entry 34-6 at 4.) In his later Equal Opportunity and Compliance interview, Dixon stated that the reasons for firing Plaintiff included "errors in the vacancy report," failure to receive the organizational charts, and "going back and forth with the invoices," referring to a conflict between Plaintiff and another employee, Kim Duong ("Duong"), regarding completion of invoices. (Docket Entry 34-3 at 4; see also Docket Entry 32-2 at 60:8-63:14 (detailing the interactions between Plaintiff and Duong).)[2] Dixon also cited Plaintiff's "conduct" as a reason for her firing, stating:

> It was the chain of command. I couldn't understand why she couldn't come to me to get answers or come to me and then go behind if she wasn't satisfied. With an

---

[2] On February 24, 2016, Plaintiff and Duong attended a facilitated meeting that "was productive with resolving issues between [Plaintiff] and [Duong]." (Docket Entry 34-2 at 74:10-74:25.)

-6-

> executive assistant, there has to be a strong relationship of trust . . . . The trust factor was just gone. My whole way of managing changed for one person. I couldn't come in and be myself because I had to be aware of what I was saying at all times. I was always afraid if you say it one way meaning one thing, she's going to take it another way, and then she's going to take it to HR or wherever.

(Docket Entry 34-3 at 4.) Before Plaintiff's firing, Dixon spoke with his supervisor, Anna Wu ("Wu"). (See id.) Wu asked for the facts in support of firing Plaintiff, and Dixon "told her about the performance, the chain of command, the trust factor." (Id.) By "trust factor," Dixon explained that he meant the following:

> I got to believe that if I'm talking to you and I'm saying, "This is how it is," and you come to me for training and I say we're going to do this a little bit later, trust me that we'll look at it, but for you to immediately not give it a chance and immediately go to HR, and that had happened so many times, over and over.

(Id.) Dixon further stated that he "couldn't help but be aware" that Plaintiff had made complaints to HR about him. (Id.)

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (Docket Entry 34-13) and obtained a Notice of Right to Sue letter (Docket Entry 34-14) before bringing the instant suit.

## DISCUSSION

### I. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

-7-

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of h[er] evidence as forecast assumed, h[er] version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to h[er].'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

## II. Title VII and Title IX Retaliation Claims

As an initial matter, because "Title VII, and the judicial interpretations of it, provide a persuasive body of standards to

-8-

which [courts] may look in shaping the contours of a private right of action under Title IX," Preston v. Commonwealth of Va. ex. rel. New River Cmty. Coll., 31 F.3d 203, 207 (4th Cir. 1994), Plaintiff's retaliation claims under Title VII and Title IX involve the same analysis, see Mandsager v. University of N.C. at Greensboro, 269 F. Supp. 2d 662, 676 (M.D.N.C. 2003) (denying the defendants' motion to dismiss Title IX retaliation claims because the plaintiff "alleged sufficient facts to state a claim for retaliation under Title VII").

To establish a prima facie case of retaliation, "[P]laintiff must prove three elements: (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events." E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005); see also Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 184 (2005) (concluding that Title IX authorizes a private cause of action for retaliation where the employee establishes that the educational institution "retaliated against [her] *because* [she] complained of sex discrimination" (emphasis in original)). The "touchstone" in retaliation-based claims "is whether the plaintiff's course of conduct as a whole (1) communicates to her employer a belief that the employer has engaged in a form of employment discrimination; and (2) concerns subject matter that is actually unlawful . . . or that the employee reasonably believes to

-9-

Case 1:16-cv-01410-TDS-LPA   Document 36   Filed 06/27/18   Page 9 of 16

which [courts] may look in shaping the contours of a private right of action under Title IX," Preston v. Commonwealth of Va. ex. rel. New River Cmty. Coll., 31 F.3d 203, 207 (4th Cir. 1994), Plaintiff's retaliation claims under Title VII and Title IX involve the same analysis, see Mandsager v. University of N.C. at Greensboro, 269 F. Supp. 2d 662, 676 (M.D.N.C. 2003) (denying the defendants' motion to dismiss Title IX retaliation claims because the plaintiff "alleged sufficient facts to state a claim for retaliation under Title VII").

To establish a prima facie case of retaliation, "[P]laintiff must prove three elements: (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events." E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005); see also Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 184 (2005) (concluding that Title IX authorizes a private cause of action for retaliation where the employee establishes that the educational institution "retaliated against [her] *because* [she] complained of sex discrimination" (emphasis in original)). The "touchstone" in retaliation-based claims "is whether the plaintiff's course of conduct as a whole (1) communicates to her employer a belief that the employer has engaged in a form of employment discrimination; and (2) concerns subject matter that is actually unlawful . . . or that the employee reasonably believes to

be unlawful." DeMasters v. Carilion Clinic, 796 F.3d 409, 418 (4th Cir. 2015) (emphasis, ellipsis, citation, and internal quotation marks omitted).

The Fourth Circuit has explained "that the threshold for oppositional conduct is not onerous. Instead, when an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." DeMasters, 796 F.3d at 417 (emphasis, brackets, ellipsis, and internal quotation marks omitted). Protected oppositional activity includes an employee's complaints to her "superiors about suspected" sexual harassment. Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 544 (4th Cir. 2003). Notably, the complained-of conduct need not rise to the level of an independent sexual harassment claim under Title VII. As the Fourth Circuit recently emphasized, "Title VII's primary objective . . . is not to provide redress but to avoid harm," and the statute reflects "the hope and expectation that employees will report harassment early, before it rises to the level of a hostile environment." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 282 (4th Cir. 2015) (internal quotation marks omitted). "Title VII must [therefore] be read to provide broader protection for victims of retaliation than for even victims of . . . gender-based discrimination, because effective enforcement could only be

expected if employees felt free to approach officials with their grievances." Id. at 283 (brackets, ellipsis, and internal quotation marks omitted).

In light of this rationale, "an employee is protected when she opposes not only employment actions actually unlawful under Title VII but also employment actions <u>she reasonably believes to be unlawful</u>." Id. at 282 (emphasis added) (brackets, ellipsis, and internal quotation marks omitted). Put another way, at the time an employee complains of perceived sexual harassment, "[t]he Title VII violation may be complete, or it may be in progress," but said employee remains "protected from retaliation" even though the sexually hostile work environment "[is] not fully formed." Id. This standard does not require "additional evidence that a plan is in motion to create [a sexually hostile work] environment or that such an environment is likely to occur." Id. at 284.

Finally, "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." <u>University of Tex. Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 360 (2013).

Here, a reasonable factfinder could conclude that the evidence shows that Plaintiff communicated to UNC her reasonable belief that Dixon engaged in sexually harassing behavior (even though that

-11-

behavior did not actually rise to the level of an actionable hostile work environment), such that she engaged in protected oppositional activity.  Shortly after Plaintiff began working as his executive assistant, Dixon stated in her presence: "[W]hen I love[,] I love hard."  (Docket Entry 34-2 at 103:21-104:6.)  He then subsequently commented that she "was 50 percent here and 50 percent in Maryland and that maybe when [her] husband moves here, [Dixon will] get his other 45 percent."  (Id. at 91:19-92:14.)  Plaintiff contacted Tracy Agnew in HR regarding that comment as she believed that it "was [in]appropriate and not professional to do it in front of a coworker[ a]nd it was touching onto [her] personal life, which [she] really felt was inappropriate."  (Id. at 92:8-10.)  In addition, Plaintiff felt uncomfortable hearing Dixon's comment that her travel to Maryland caused "wear and tear on her body, [because] the only person who should be concerned about [her] body is [her] husband, not [Dixon]."  (Docket Entry 34-6 at 7.)  Dixon's inquiries into Plaintiff's living arrangements (including in a closed-door one-on-one meeting) (see Docket Entry 32-2 at 94:9-94:21), as well as the fact that he apparently did not ask other employees about their living arrangements (see Docket Entry 34-6 at 3), also support Plaintiff's contention that she reasonably believed that Dixon engaged in sexually harassing behavior.

Further, Plaintiff informed Agnew and later Jones and Nash that "as a teenager . . . [she] was raped, and [she] didn't use

-12-

[her] gut feeling, and [she] ended up in a situation where [she] was raped . . . ." (Docket Entry 34-6 at 3.) Plaintiff "told them [Dixon's comments were] making [her] uncomfortable," and, although she did not use the words "sexual harassment" with Jones and Nash, she stated that she did not do so because "[s]ometimes you don't have to say it was sexual harassment to figure out what the other person was feeling. The fact that [Dixon] wasn't do[ing] it with anyone else, it[']s clear cut." (Id. at 4.)

Given the low threshold for protected oppositional conduct in the retaliation framework and the "hope and expectation that employees will report harassment early, before it rises to the level of a hostile environment," Boyer-Liberto, 786 F.3d at 282 (internal quotation marks omitted), a genuine issue of material fact exists as to whether Plaintiff held and communicated a reasonable belief that Dixon subjected her to sexual harassment, even though his conduct did not rise to the level of a fully formed hostile environment violation. Accordingly, UNC has not established entitlement to judgment as a matter of law on the first element of Plaintiff's retaliation claim.

As to the second element of a retaliation claim, UNC does not dispute that Plaintiff's firing qualified as an adverse employment action. The final element, a but-for causal connection between the adverse action and the protected activity, also presents a material factual dispute that precludes summary judgment. UNC maintains

-13-

that it fired Plaintiff for unsatisfactory performance rather than as retaliation for contacting HR. (See Docket Entry 35 at 8-10.) However, statements from Dixon constitute direct evidence from which a reasonable factfinder could conclude that Plaintiff's reports to HR played a substantial role in her firing. Asked why he sought Plaintiff's firing, Dixon briefly cited deficiencies in her job performance, but devoted substantially more time to explaining his grievances regarding Plaintiff's "conduct." (See Docket Entry 34-3 at 16.) In that regard, Dixon stated that "[t]he trust factor was just gone" between him and Plaintiff. (Id.) Asked to define "trust factor," Dixon stated:

> I got to believe that if I'm talking to you and I'm saying, "This is how it is," and you come to me for training and I say we're going to do this a little bit later, trust me that we'll look at it, <u>but for you to immediately not give it a chance and immediately go to HR, and that had happened so many times, over and over</u>.

(Id. (emphasis added).) Regarding Plaintiff's "conduct," Dixon further elaborated: "I couldn't come in and be myself because I had to be aware of what I was saying at all times. I was always afraid if you say it one way meaning one thing, she's going to take it another way, and then she's going to take it to HR or whatever." (Id.) Moreover, according to Jones's declaration, "Plaintiff was terminated based on the evaluation of her performance <u>and conduct</u> during the probationary period." (Docket Entry 32-10, ¶ 42 (emphasis added).) This language could support a finding that

-14-

Plaintiff's firing did not result (at least solely) from her job performance, but rather stemmed from her reports to HR.

Taking the evidence in the light most favorable to Plaintiff and giving her the benefit of all permissible inferences, a reasonable factfinder could conclude that UNC would not have fired Plaintiff but for her engagement in a protected activity. Dixon referred to the erosion of the "trust factor" as a primary component of Plaintiff's objectionable "conduct." (See Docket Entry 34-3 at 4.) The absence of the "trust factor" resulted from Plaintiff "immediately go[ing] to HR . . . over and over" and Dixon's fear that "she's going to take [what he says] to HR or wherever." (Id.) Moreover, Plaintiff neither received specific reasons for her termination on the date UNC fired her, nor a corrective action plan for any failure to meet job-related expectations. (See Docket Entry 34-6 at 4; Docket Entry 34-7 at 5; see also Docket Entry 34-8 at 5-7 (setting forth Plaintiff's assertions that she sent Dixon organizational charts notwithstanding his denial of receiving them).) Ultimately, disputed evidence regarding Plaintiff's job performance, alongside the statements from Dixon and Jones that Plaintiff's firing resulted from both her performance and conduct, would allow a reasonable factfinder to decide that UNC would not have fired

Plaintiff but for her conduct, i.e., reporting Dixon to HR.[3]

In sum, the record precludes entry of judgment as a matter of law for UNC.

### **CONCLUSION**

The evidence before the Court raises a genuine issue of material fact as to Plaintiff's retaliation claim.

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion for Summary Judgment (Docket Entry 32) be denied.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

June 27, 2018

---

[3] UNC also has argued that Dixon "was not present when Plaintiff disclosed her rape to HR," and therefore "Dixon could not have retaliated against Plaintiff for conduct of which he was unaware." (Docket Entry 35 at 3.) However, Dixon did not fire Plaintiff unilaterally. Rather, Dixon stated that the decision to terminate Plaintiff's employment involved "input from Tracy [Agnew] in HR. . . . [and] input from Employee Relations, which would have been Gena Carter, Chariss Jones." (Docket Entry 34-3 at 15.) "[Dixon's] part was that [he] came up and said, 'I'd like to terminate and these are the circumstances,' so they would evaluate and then said ok based on that." (Id.) As stated above, Plaintiff reported her prior rape and its impact on her perception of Dixon's behavior to Jones and Agnew. (See Docket Entry 34-6 at 7.)

-16-